JACOB HART ET AL. v. JACKSON RUST.

1. DELIVERY OF DEED.—The fact that a deed, after its delivery to the grantee, had been by him returned to the grantor, for safe keeping, during the minority of the grantee or during an expected absence, neither negatives or disproves its previous ·delivery, nor annuls or destroys its effect to pass title to the property embraced in it, as between the parties.

2. CONSTRUCTION OF DEED.—When an instrument is drawn in the form of a deed, and delivered as such, couched in appropriate language to indicate its purpose and have effect as such, the court will not, by construction, give it a different effect.

3. SAME.—An instrument made and delivered by a father to a son, purporting to convey lands and other property to a minor son, in carrying out a partition of the greater part of the father's estate between the minor and a married sister, to whom a like share had been at the same time conveyed, and providing that the parents, or the survivor, shall have the possession during life, and in event of the death of the grantee without issue, and made at the same time that a will was written and signed, will not be construed, as between the grantee and the legal representatives of the father, to be a will, but will be held, as between such parties, a deed.

4. SAME.—Nor will the fact that sufficient property was not retained by the grantee, invalidate such a conveyance, as between the grantee and the legal representatives of the grantor.

5. SAME—RIGHTS OF CREDITORS.—Only creditors or purchasers without notice of such deed, or parties holding under such, could attack the deed.

6. SAME.—A direct proceeding on the part of creditors, or for their use, would be required to reach the estate, conveyed by such deed, by having the conveyance annulled.

7. EXECUTION OF POWER.—One of several trustees, in whom is vested the power to sell, cannot execute a conveyance that will pass title to the trust estate.

8. SAME—EXECUTORS.—Where two executors are appointed with power to administer an estate, without control of the Court of Probate, and both qualify, a deed by one for land of the estate, is inoperative.

9. Johnson *v.* Bowden, 37 Tex., 621, and 43 Tex., 676, distinguished from this case.

APPEAL from Wharton.   Tried below before the Hon. William H. Burkhart.

By an act of the Legislature of the State of Texas, ap-

proved January 16th, 1858, and taking effect from its pass-age, the county of Wharton was given power to levy, upon all persons and property in the county, a special tax to aid in the construction of a railroad from Brazoria county to some point in the county of Wharton; and it was provided, (sec. 4,) that if the County Court should fail to levy and collect said tax, the act itself levied it.

Under this law a tax was levied by the County Court, 22d May, 1858, and annually thereafter.

On 20th May, 1859, A. C. Horton, and other dissatisfied tax-payers of Wharton county, sued out an injunction to re-strain the collection of this tax, and filed bond as required by law. This injunction was dissolved, on motion, by the Dis-trict Court, in 1859, and the plaintiffs appealed. This appeal remained undetermined until April 18, 1870.

In 1860, according to the tax-rolls of Wharton county, A. C. Horton and wife owned community property, the taxable value of which was $255,899.

On the 27th day of December, 1861, the war having com-menced, A. C. Horton and wife determined to make a divis-ion of property between their children, and a testamentary disposition of all their worldly effects. They had but two children—Patience, then wife of I. N. Dennis, esq., and Robert, an unmarried minor. On that day, they executed three written instruments to carry into effect their intention: *first*, to Patience, they made a deed of gift of real and person-al property, amounting in value, according to the tax-rolls of 1862, to $118,180, an advancement; *second*, to Robert, they executed a conveyance of an equal amount, from which we copy: "In consideration of the fact that they have, by deed of even date herewith, conveyed to Patience certain property therein mentioned, and being desirous of securing to their son Robert a like amount of property, do, in consideration of the love and affection they have for him, give, grant, and convey unto him the following property, subject to the trusts and conditions herein mentioned," (then follows description

of the property conveyed, the balance of the Martin Allen league, including the land in controversy, being conveyed,) "to have and to hold the aforesaid land and negroes, to him, the said Robert, subject to the following terms and conditions, that is to say: We are to have and retain the possession and control of the aforesaid property, lands and negroes, during our lifetime, and upon the death of either of us, the survivor is to have and retain the possession of said property; and we reserve and retain in us the absolute right to have, use, control, manage, and dispose of all the income and profits of said property, (except the increase of the negroes,) during our lives, and the survivor to have the same rights during his or her lifetime after the death of either. In the event of the death of the said Robert during the life of us, or the survivor of us, the lands," &c., "shall revert to us, or the survivor of us, provided, however, he dies leaving no issue. And in the event of his death without issue after our death, the same shall revert to our daughter, Patience, or to her issue, in the event of her death prior to the death of the said Robert."

Signed by A. C. Horton and Eliza Horton, and acknowledged, but not recorded till February 12, 1866, after A. C. Horton's death.

*Third,* A. C. Horton made his will. 1st clause recites, that having this day given, by deeds of conveyance or gift, certain lands and other property to his children, he bequeaths to his wife, after the payment of his debts, the remainder of his property, for life; 2d clause wills his wife the plantation, tools, &c., on the plantation, deeded to Robert by deed of this date; 3d clause provides for an equal division, after his wife's death, between his two children, or their issue; 4th clause appoints J. N. Dennis and testator's wife executors of his will, and takes the administration out of the Probate Court.

Dennis and wife went into immediate possession of the property conveyed to them.

The deed to Robert Horton was handed him when made, but returned to A. C. Horton, by Robert, for safe-keeping.

A. C. Horton and wife retained possession of all the property conveyed to Robert. The deed to Robert never afterwards came into the possession of Robert until after his father's death.

In 1861, prior to these transfers, the tax value of A. C. Horton and wife's property was $255,899. They gave to their daughter, in value, $118,180, as shown by tax-rolls of 1862. They gave to Robert a like amount, $118,180, leaving in their hands, (if the transfer to Robert was held to vest a present title as against creditors,) liable to debts, only the sum of $28,431. They owed, in 1861, according to the testimony of Phillips, besides the taxes due and unpaid, and other debts, $76,000; and up to 1865, so far as we can discover from the evidence, only $10,000 of that debt had been paid. The mortgages seem to indicate that a South Carolina debt was $64,000 instead of $60,000, as Phillips testifies.

Being thus indebted, Dennis and wife, on 27th December, 1861, in consideration of the deed of gift from A. C. Horton and wife, executed a covenant to Horton and wife, agreeing that the property that day conveyed to them by deed of gift should be bound for one half of A. C. Horton's debts, with some provisos. This document, it appears, however, was never acknowledged for record, or recorded, but simply transcribed in a record-book, from which it is taken.

In 1865, A. C. Horton died. August 27, 1866, the will was probated and the executors qualified. Mrs. Horton, executrix, on 28th January, 1867, returned an inventory of A. C. Horton's estate, including therein 2,400 acres of the Martin Allen league, the same land conveyed to Robert in 1861, and it includes the land in controversy.

Robert Horton, in 1866 or 1867, went into possession of the land in controversy, by consent of the executors; and says that he considered he went into possession under the deed of 27th December, 1861, and also as heir.

On 28th September, 1868, C. S. Betts and Jackson Rust each obtained a judgment against Robert Horton, together amounting to $1,735.57. Meantime the tax injunction

suit was pending.    No railroad taxes had been paid by A. C. Horton, or his estate, since it had been sued out.    On 10th April, 1870, the Supreme Court affirmed the judgment in the court below, dissolving the injunction.

By copies of records of decrees annexed to motion for a new trial, it appears that on 20th December, 1870, Horton's estate being represented as insolvent, 200 acres of the Martin Allen league were set apart for the widow, upon the petition of herself and her son Robert; and on 6th December, 1871, 280 acres were sold off the same land to pay widow's year's allowance.

November 7, 1871, Wharton county sued the executors of Horton's estate for the railroad taxes accrued from 1859 to 1864, inclusive, and 14th December, 1871, recovered judgment for \$3,572.89.    The judgment directs personal property to be sold to pay the debt; and if none exists, then, real estate.

February 6, 1872, I. N. Dennis, executor, sold forty acres of the Martin Allen league, a part of the land included in the deed to Robert Horton of December 27, 1871.    A. D. McLean purchased it for \$340.    Deed was made April 1, 1872.

Dennis, executor, had a tenant on the land when McLean purchased it, who attorned to McLean, and paid him rent from January 1, 1872.    January 3, 1873, McLean sold to Jacob Hart.    McLean and Hart have had possession ever since McLean purchased.

September 14, 1872, executions issued on the two judgments mentioned, in favor of C. S. Betts and Jackson Rust, against Robert Horton; were levied upon Robert Horton's interest in the Martin Allen league, which was sold by the sheriff and purchased by Jackson Rust, at $12\frac{1}{2}$ cents per acre.

February 20, 1873, Mrs. Eliza Horton, in consideration of the obligation of Jackson Rust to deed to Robert Horton or his wife, two hundred acres of land, released, by a conveyance to Jackson Rust, all her right, title, and interest in the

Martin Allen league. January 4, 1873, this suit was brought. Rust brought trespass to try title against Hart & McLean. Defendants set up their title under the sale for tax, in defense.

On the trial, plaintiff, over objections which are given in full in the opinion, read the deed from A. C. Horton to Robert J. Horton, substantially set out above, also the judgments, one in favor of Betts, the other in favor of Rust, against Robert Horton; executions issued under them; levy upon the land described in the petition; and the sheriff's deed conveying to Jackson Rust the interest of Robert Horton, in said land, of date November 5, 1872.

Robert Horton testified, that at the execution of the deed to him there was a division made by his parents, of the negroes, between his sister, Mrs. Dennis, and himself. The slaves selected for him, and the land, were conveyed by the deed, and the deed was handed to him by his father, A. C. Horton, he saying, "here is the deed to your property." Witness placed the deed in the hands of his father for safe-keeping; that after his father's death, he held possession of the land, &c.

Plaintiff then read release to him, by Mrs. Eliza Horton, widow of A. C. Horton, of date February 20, 1873, for the land in controversy, of all her interest. It was admitted that both parties claimed under A. C. Horton.

The defendant proved, that the consideration of Mrs. Horton's release to Rust was his release to Robert J. Horton or his wife of two hundred acres of land; that at the time Dennis, executor of Horton, sold to McLain, there was a tenant on the land, about April 1, 1872; that McLain, about January 1, 1873, sold to defendant Hart, who then took possession of the forty-acre tract so purchased of Dennis.

Defendant then read in evidence the will of A. C. Horton, (substantially as stated above,) admitted to probate August 29, 1866, and inventory of Mrs. Horton, containing the land in controversy.

It was admitted that both I. N. Dennis and Mrs. Eliza

Horton qualified as executor and as executrix under the will. The injunction proceedings, as stated above, were admitted; also the proceedings, as stated, to enforce the accumulated railroad tax by suit against I. N. Dennis and Eliza Horton.

Defendant proved that, at the date of the deeds to Mrs. Dennis and to Robert J. Horton, A. C. Horton was indebted about $80,000, of which a debt of $60,000 in South Carolina was included; that A. C. Horton, in 1863, went to South Carolina for the purpose of paying the debt, and on his return said he had settled it in part; that $10,000, in favor of one Cardwell was paid by Horton before his death, in 1865. It was stated that Horton was always regarded as solvent.

The deed from I. N. Dennis, as executor, was then read, conveying forty acres to A. D. McLain, of date April, 1872—the deed reciting that the sale was made under the judgment for the said taxes, and to the highest bidder.

It was admitted that Mrs. Eliza Horton refused to join I. N. Dennis in the deed to McLain. In rebuttal, it was proven that A. C. Horton, during his life, was always regarded as solvent. An agreement by Dennis and wife was read, by which they agreed to hold the property deeded to Mrs. Dennis, subject to half of the debts of A. C. Horton, in case of his death, and after the claims due him had been applied to their satisfaction.

Judgment was rendered for plaintiff, and defendants appealed.

*A. B. Peticolas*, for appellants, after stating the case, argued:

I. What is the proper construction, under all the facts, to be placed upon the conveyance from A. C. Horton to Robert, and what estate is granted by it?

It is submitted, that Wharton county was a community creditor for the tax from 1856 to 1865, and that by their purchase from the executor of the property sold to pay that debt, after it had become a judgment, appellants have all the rights, and are entitled to all the protection, that Wharton

county had or was entitled to; and as the purchasers at the sale satisfied a valid judgment against the estate, they are subrogated to all the rights of the judgment creditor. (McDonough *v.* Cross and Wife, appeal from Rusk, decided March 30, 1874. [Wharton county was prevented from collecting this debt by the injunction of the tax payers.] The property conveyed to Robert Horton was community property, and the conveyance was avowedly made to him because he was an heir, and in consideration of love and affection. It was made by his father, at a time when he was heavily in debt, and did not have enough property, without that conveyed to his two children, to meet his debts. So thoroughly was Horton satisfied of that, that he clogged the property conveyed to Mrs. Dennis, with a responsibility for his debts; not, however, to benefit creditors, but in order to prevent the shares of his two children from becoming unequal, by reason of Robert's share having to bear the burden of all the debts, and thus being made less.

If this conveyance could take effect at all, as to creditors, as a deed, it could only take effect upon the day of its registration, April 12, 1866. The Wharton county debt had then all accrued; and as this was a mere voluntary conveyance, it must be held void as to subsisting creditors. (Paschal's Dig., 3876; Raymond *v.* Cook, 31 Tex., 384–6.)

A purchaser at sheriff's sale takes only the title that the judgment debtor had. Therefore Rust is in the shoes of Robert Horton, so far as the defendants are concerned, because McLean's title was of record before Rust purchased. McLean acquired all the rights of Wharton county by his purchase, and the controversy is narrowed down, upon this question, to a controversy between a creditor of the estate and an heir claiming under a deed of gift not yet made operative by present right of possession. A title from an administrator, under a sale made for the payment of debts, is better than the title of the heirs, accompanied by five years' possession. (Cornett *v.* Williams, 20 Wall., 226.)

Even an absolute and unconditional advancement is liable to the debts of the donor, existing at the date of the advancement, upon the ground of presumptive fraud.

A judgment creditor, whose debt existed prior to a donation, *inter vivos*, but who obtained his judgment after the donation was made, can have the donation set aside as presumptively fraudulent, and the property donated subjected to the payment of his debt; provided the donee fail to show other property, unincumbered, to an amount sufficient to pay the debt. (Chase *v.* McCoy, 11 La. Ann., 195; Caswell *v.* Hill, 47 N. H., 407.) And the donation, or advancement, need not be of such an amount as to threaten insolvency, in order to render the deed presumptively fraudulent and void as to creditors.

In Lowry *v.* Fisher, 2 Bush, (Ky.,) 72–77, it appeared that in 1859, Lowry owned property to the amount of $100,000; that he owed debts of his own, $20,000, and was liable as security on bonds, &c.

In 1859, he made a deed of advancement to one of his children, who went into possession of the property, to the amount of $18,600. In 1862 and 1863, creditors sued to set aside the deed to his son, and the court held it void as to existing creditors. (See also Mitchell *v.* Berry, 1 Met., (Ky.,) 602.)

The leading case on this subject, in Maryland, is Williams *v.* Banks, 11 Md., 199. In this case, Mrs. Chase, being very wealthy, made a déed August 22, 1844, conveying to trustees all of her property, to hold in trust for her (the grantor's) own use, during her life, paying to her the incomes arising therefrom, which amounted to the sum of $4,337 per year, and, after her death, remainder to her daughter and grandchildren. She was ninety years old when the deed was made. When she made the deed, she owed $3,956, and it required for her support $200 annually. The courts, citing Reade *v.* Livingston, 3 Johns. Ch. Rep., 481; Salmon *v.* Bennett, 1 Day, (Conn.) Rep., 525, decided that no fraudulent intent was neces-

sary to make a voluntary deed to children void as to existing creditors. Speaking of Mrs. Chase, the court said: "Although she lived some four years after making the deed, and during that period her life estate may have yielded sufficient funds to have paid all her debts and the liabilities for which she was bound to make ample provision at the date of the deed, still that instrument cannot be relieved from the effect of the imputation of fraud, at its date, in regard to those debts and liabilities, if they have not been actually paid, and it is not alleged they have." And on page 254, they say: "In this case, however, we do not believe there was any intention, on the part of Mrs. Chase, to commit any fraud, whether on existing or subsequent creditors;" but the deed was set aside and held invalid, as to existing creditors, when it was made. And on the subject of the rights of creditors to have preference to heirs, and upon the subject of the executor's power to make sale of the property to pay A. C. Horton's debt, see McDonough v. Cross, appeal from Rusk, decided March 30, 1874. (Kehr v. Smith, 20 Wall., 31.)

It is said, the gift is not yet operative by the right of possession, for Mrs. Horton's deed of release cannot operate to give Rust the present right of possession as against a creditor. (Mitchell v. De Witt, 20 Tex., 299.)

It is not deemed important to discuss defendant's title, as, plaintiff must recover upon the strength of his own title; but we quote here authority to show that one executor alone may convey perfect title. (Williams on Exrs., 810, 811, 813; Redfield on Wills, 222, 223; Johnson v. Bowden, 37 Texas, 621; 8 Tex., 235.) But this is altogether a collateral issue, which cannot be made in this action. (Cornett v. Williams, 20 Wall., 246; Boggess v. Howard, 40 Tex., 153.) And for authority to take a money judgment for a debt against an estate, without making the heirs parties to the suit, we refer to the probate law of 1870, sec. 160.

II. We reach now the second question: What estate is

granted by Robert Horton's deed, and what is the proper construction of it?

Suppose we are in error in our foregoing conclusions, and that Rust's title is entirely unaffected by the fact that appellant represents a creditor of the community, seeking to recover a community debt from a community fund—what interest was, by the deed of the 27th of December, 1861, conveyed to Robert Horton?

It is certainly not a fee-simple title. "A fee simple is a pure inheritance, clear of any qualification or condition. It is an estate of perpetuity, and confers an unlimited power of alienation, and no person is capable of having a greater estate or interest in land." (4 Kent, 5.) Nor is it an advancement. An advancement is a gift from a parent to a child, by anticipation of what it is supposed a child will be entitled to at the death of a parent. (Cawthorn v. Coppedge, 1 Swan, 487; Holliday v. White, 33 Tex., 447.) But to constitute an advancement, the ancestor must, in his lifetime, divest himself of all interest in the property. (Gray v. Gray, 22 Ala., 233; Crosby v. Covington, 24 Miss., 619; Bing. on Desc., 316.) It is a grant simply of a contingent interest in land, which may never take effect in possession.

Devise to S for life, and after his death, to W, if then living, and if W is not living, then to the heirs of W, gives W only a contingent interest. (Bing. on Desc., 64.)

It grants to Robert Horton a contingent interest, because it depends upon his outliving his mother. Nor does it grant him such an estate, nor are the limitations over of such a character as to give room for the operation of the rule in Shelly's case, and raise a contingent fee in him, to become absolute, in the event of his outliving his mother. First, because the limitation over is to named persons, and is to take effect if he dies without issue. Second, because the limitations over would not create an entail at common law. (Anderson v. Jackson, 16 Johns, 382; Bing. on Desc., 136, 438.) Third, because the property is not limited, to go at

his death, as it would go by the law of descents and distributions. (Hancock v. Butler, 21 Tex., 808, 812; Daniel v. Whartenby, 17 Wall., 640; which last case is conclusive on the point.)

We have thus endeavored to show the *quantum* of interest taken by Robert Horton under the grant from his father, but it still remains to consider in what right or capacity he took. Did he take as a purchaser? and does he come into this court in the same attitude as one who has bought and paid for a valuable right, or does he take simply as heir only, and are his rights those of an heir, and nothing more?     *     *     *

Such a conveyance as that to Robert Horton has always been construed to be a will. (Crain v. Crain, 17 Tex., 87–90; 21 Tex., 796; Ferguson v. Ferguson, 27 Tex., 340, 343, and authorities there cited; Ellison v. Keese, 25 Tex. Supp., 83, 90; Millican v. Millican, 24 Tex., 441, 442; see on this point, as almost precisely in point, Woodall v. Rudd, 41 Tex., 375.) There is no question in this case as to the possession. There never was seizin of the property in Robert Horton. The terms of his conveyance, even up to this day, (his mother being still alive,) prohibits him from claiming possession under that, and it is clear he has none in any other right; and there was nothing to indicate to creditors even a contingent right in him to future possession, until his deed was recorded in 1866.

We conclude then, that the writings of December 27, 1861, were all, to a certain extent, testamentary; and by analogy to the rules governing contracts, we may say, that cotemporaneous writings between the same parties, with reference to the same subject-matter, are parts and parcels of the same transactions. (Dunlap v. Wright, 11 Tex., 602; The Howards v. Davis, 6 Tex., 180.) Robert Horton, if he takes at all, takes under this will in disguise, and takes as an heir; and as heirs cannot take until their father's debts are paid, the title of a judgment creditor to the land, sold to pay the ancestor's debt, is bound to be better than the title of the heir.

The common property is a security for the community debts, and neither the heirs of the wife or husband have any interest, except in that portion which remains after the payment of such debts. (Thompson *v.* Cragg, 24 Tex., 600; Burleson *v.* Burleson, 28 Tex., 418; Paschal's Dig., art. 4646; Succession of W. G. Kerby, 18 La. Ann., 434, 582; Lawson *v.* Ripley, 17 La., (O. S.,) 247, 248; Hart *v.* Foley, 1 Robin., (La.,) 380, 381; Fortier *v.* Slidell, 7 Robin., (La.,) 404; Succession of Thomas, 12 Robin., (La.,) 215, 266.)

If the conveyance to Robert Horton is a will as to him, it is equally a will as to Mrs. Horton, for her rights under it did not vest until after the death of A. C. Horton, so far as A. C. Horton's interest in the property was concerned; and as to her own interest, reserved to herself by herself, in the instrument, it was no less and no greater than she had by virtue of her being one of the partners in the community without it. The effect of the opening of administration upon A. C. Horton's estate was, to suspend her interest in the community until the debts of the estate were paid and the administration was closed. An administration upon a community estate operates as well upon the wife's as the husband's interest. (Tucker *v.* Brackett, 28 Tex., 339, 340; Estate of Tomkins, 12 Cal., 114.) She cannot by her own deed to her son, reserving a life estate to herself, withdraw any part of the community property from its liability for community debts, and vest that interest so withdrawn in herself, free from that liability, any more than her husband could. A vendee takes subject to the administration. (Mitchell *v.* DeWitt, 20 Tex., 299.)

III. What is the legal force and effect of Mrs. Horton's deed of release to Jackson Rust? If the last foregoing propositions be correct as law, I have, in them, almost fully answered the question. But her position when she made this deed of release, and her actions and representations with regard to the property conveyed, must be considered. It is conceived that these operate upon her and her privies in estate, as an

equitable estoppel, and are sufficient to prevent her or her privies from now setting up an adverse claim to her life estate in this property, as reserved in the deed to Robert Horton:

First. In a sworn inventory she returns this property as belonging to the estate of A. C. Horton. Second. The executors of the estate of A. C. Horton have, since 1866, managed and controlled it as executors, and put tenants upon it, and, we may fairly presume, received and used the proceeds of it in the administration. Robert himself went on it by their consent. Third. She has never, so far as the evidence shows, set up a claim to the right of possession or profits of this property, as against the estate being administered. Fourth. She has had a homestead set apart out of it as a part of A. C. Horton's estate, and also a year's allowance. Fifth. She has, without a word of complaint, allowed her co-executor to sell it to pay the debts of the estate. And after all this, and after McLean has paid his money, received his deed, and recorded it, she sets up a claim to it adversely to the estate. She is estopped by her conduct and by her silence, when she should have spoken, and Rust, who is a privy in estate, is also estopped. (Big. on Estop., 425, 493, 500, 501.)

We are aware that an administrator, by the decisions of our State, is not estopped by the return of an inventory alone from asking to amend it, and taking therefrom property claimed by himself, but this has never been held in a case where the rights of third parties have intervened and the title to the property has passed out of the estate. But, on the contrary, a purchaser under such circumstances, who has paid his money, has been protected as an innocent purchaser even as against minor children who were not (upon the face of the records) parties to the decree of partition under which the separate property of their father was partitioned as community property. The property was afterwards sold by the widow, and it was held that the heirs could not recover of the purchasers. (Davis *v.* Wells, 37 Tex., 606.)

Upon the whole record, we believe that there is no title in

Jackson Rust that can support an action of trespass to try title as against appellant. If Robert Horton takes as heir, and takes a contingent interest in lands only, he takes such a mere equitable interest as cannot be sold under execution. (Rorer on Judicial Sales, 5541; Hendricks *v.* Snedikir, 30 Tex., 306; Curlin *v.* Hendricks, 35 Tex., 247.)

And it would seem to be a safe rule not to permit heirs to recover property of the estate in their own name, unless they make it appear that the administration has been closed, or that no debts exist against the estate. (Giddings *v.* Steele, 28 Tex., 748; 20 Wallace, 226.)

Appellee's title is not supported by the release from Mrs. Horton, for it seems clear that she is estopped from claiming the right released as against appellants. And lastly, if all our previous positions are erroneous, it is clear that neither the estate nor the heirs of the deceased debtor can recover back the property sold to pay the ancestor's debt, without refunding the purchase-money, as a judgment debtor is required to do when an execution sale is pronounced invalid. (Howard *v.* North, 5 Tex., 290; Herndon *v.* Rice, 21 Tex., 450; Andrews *v.* Richardson, 21 Tex., 287.) So that we think we are authorized in asking the court in this case to reverse and dismiss.

*George Quinan,* for appellee.

MOORE, ASSOCIATE JUSTICE.—This suit was brought by the appellee for the recovery from the appellants of forty acres of land, a part of the Martin Allen league, which is admitted by both parties to have formerly belonged to A. C. Horton, and under whom they both claim to derive title.

A number of questions of much interest have been discussed by counsel, the proper determination of some of which is by no means free from difficulty. It is not necessary, however, in the view we take of the case, for us to pass upon but few of them; and these are not believed to be of difficult

solution. The point upon which appellants chiefly rely in support of their claim to the land, and to defeat that of appellee, is, that the instrument of writing bearing date December 27, 1861, whereby said Horton and his wife is alleged by appellee to have conveyed the land in controversy, and other property, to his son Robert J. Horton, reserving a life estate to themselves, and the survivor of them, and also limiting the estate over, in the event of said Robert's death without issue, is inoperative, and will not serve as a link to connect appellee with said A. C. Horton's title.

1st. Because said instrument never took effect as a deed, for want of delivery, in the lifetime of said A. C. Horton.

2d. Said instrument was testamentary in its character, and was intended by the purported grantors to have effect as a will, and not as a deed.

3d. Said instrument was not made upon any valuable consideration, but was altogether voluntary, and therefore fraudulent and void, at least as to existing creditors of the grantors, at the date of its execution, or when it took effect, and as to those claiming under such creditors, or in their right.

The proof shows that the parties interested in the business to which the instrument of writing in question relates, were all present when it was executed, and were also present when the personal property was divided, and the shares allotted to the donees were set apart and pointed out to them as their property; and after said instrument had been signed by the grantors, and attested by the subscribing witnesses, it was handed to the grantee by the grantor, who said, as he handed it to him, "Here is the deed to your property." That this was a full and complete delivery of it to the grantee, admits of no question. The fact that the deed was subsequently returned to the grantor, to be preserved and taken care of by him for the grantee during his minority and contemplated absence in the army, neither negatives or disproves its previous delivery, or annuls or destroys its effect to pass the title of the property embraced in it, as

between the parties to it. (4 Kent, 455, 456, and notes; Hillebrant *v.* Brewer, 6 Tex., 49.)

We can perceive nothing in the instrument, or the circumstances connected with its execution, to warrant the inference that it was intended by the grantors to have effect as a will, and not as a deed. It is drawn in the form and was delivered to the grantee as a deed; was couched in appropriate language to indicate its purpose and have effect as a deed. Where this is the case, the court will not, by construction, give an instrument a different effect from that ordinarily imputed to it. This instrument was evidently intended to serve a like purpose, and to have like effect, as the conveyance to Mrs. Dennis for the property given to her. It certainly cannot be held that this was a will and not a deed, and that no right or title to the property therein conveyed, vested in her until after her father's death. The will, made by Horton on the same day that these instruments were executed, shows that he understood perfectly well the difference between them and the will, and his intent and purpose in making them. (Ferguson *v.* Ferguson, 27 Tex., 339, and case cited.)

It is unnecessary for us to consider whether an advancement or a voluntary settlement of property upon a child, by a parent, who does not retain ample means in his hands to discharge all his debts, is fraudulent and void as to existing creditors or not. For, if it is admitted that the deed is, in such case, invalid as to creditors and *bona fide* purchasers from the donor, it is unquestionably valid and effectual between the parties to it and their privies. If, therefore, the deed from Horton to his son should be regarded as fraudulent in law, for want of a valuable consideration, or, if it was admitted to be fraudulent in fact, though such an assumption is clearly repelled by the entire evidence in this record, it is unquestionably valid and binding upon Horton and his heirs, and *prima facie* so at least on his legal representatives. Therefore, as the appellee had acquired, previous to bringing his suit, the life estate reserved by the deed to Mrs. Horton,

as the survivor of her husband, as well as all the interest vested by it in Robert Horton, appellants have no right to complain of the judgment, unless they are creditors or purchasers of the grantors, without actual or constructive notice of the deed, or have acquired a right or interest in the land through or under such creditor or purchaser.

It is not pretended that Horton was ever indebted to appellants, or either of them. The only title which, it is claimed, they have to the land, was acquired by its purchase from Dennis, one of the executors of said Horton's will, at a sale alleged to have been made by him, under and by authority of a judgment of the District Court of Wharton county, against said Dennis and Mrs. Eliza Horton, as executor and executrix of said A. C. Horton, deceased, whereby said executor and executrix were required by the court, on or before a named day, to sell sufficient of the personal property belonging to said estate, if in their hands, to satisfy said judgment, and in default of such personal property, then to sell real estate.

There are, obviously, at least two fatal defects to the title which appellants claim to have acquired under this sale:

First. While it is now a well-established rule in this State, (however unfortunately or disastrously it may often operate as well to the creditor as to the debtor,) that when property has been conveyed in fraud of creditors, it may be levied upon and sold by the sheriff as the property of the fraudulent grantor, without a proceeding to invalidate or set aside the deed having been previously had, it has never been held, however, that the executor or administrator of the fraudulent grantor has similar authority. Or, if he should inventory and sell the property as a part of the estate, although his application for its sale should be for the payment of debts as to which the conveyance might be fraudulent, can it be claimed that the purchaser at such sale would get title? The executor being the representative of his testator, is, *prima facie,* bound by his deed, and cannot, ordinarily, impugn or

question its validity. Before such property can be sold by the executor or administrator, the conveyances must be set aside by suit against the grantee, brought by the creditor as to whom it is fraudulent, or by the executor or administrator, if, in any case, a suit of this kind may be maintained by him to annul the conveyance and subject the property to administration for the payment of such creditor. (Cobb v. Norwood, 11 Tex., 556; Avery v. Avery, 12 Tex., 54; Connell v. Chandler, 13 Tex., 5; Hunt v. Butterworth, 21 Tex., 138.)

Second. If the land was subject to sale under the order of the court, for satisfaction of the judgment, the sale of it by Dennis alone was unauthorized. By his will, Horton committed the administration of his estate to Mrs. Horton and Dennis, jointly. Both of them qualified, and were acting in settling the estate under the will. By the judgment, they were required, as executrix and executor, to make the sale. It seems to be well settled, when authority is given, by will or otherwise, to executors or trustees to sell land, and where there are one or more acting, all of them must join in the sale, or the execution of the power is invalid. (Crosby v. Houston, 1 Tex., 203; Halbert v. Grant, 4 Monr., 580; Taylor v. Galloway, 1 How., (Ohio,) 232.) In maintenance of the validity of a sale in such case by one of the executors alone, we are cited to the case of Johnson v. Bowden, 37 Tex., 621, and might also have been referred to our ruling in the second action between the same parties, where the previous decision is in effect reaffirmed. (43 Tex., 670.) But an examination will show that the point decided by the court was altogether different from that here presented. In these cases, the court held that when authority is given by will to executors to sell land, and two persons are nominated in the will as executors, but one of them dies, or fails to qualify or accept the trust, the power survives, and may be exercised by the party who qualifies and acts. It by no means follows, however, that when both have qualified, and are acting, the power entrusted to them jointly may be exercised by one of them to the exclusion of the other, with-

---

---

out his consent, and, as it seems in this case, against his wish. The judgment is affirmed.

                                           AFFIRMED.